886 So.2d 598 (2004)
STATE of Louisiana, Appellee
v.
Larry KING, Jr., Appellant.
No. 38,983-KA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 2004.
Louisiana Appellate Project, by Carey J. Ellis, III, for Appellant.
Jerry L. Jones, District Attorney, Charles L. Brumfield, Assistant District Attorney, for Appellee.
Before STEWART, DREW and LOLLEY, JJ.
DREW, J.
By a vote of 11-1, a Morehouse Parish jury convicted Larry King, Jr., of armed robbery, as charged. The defendant was *599 sentenced to 25 years at hard labor without benefit of parole, probation, or suspension of sentence. He appeals, alleging only insufficiency of the evidence. We affirm his conviction and sentence in all respects.

FACTS
At trial, the victim, Ray Yarborough, testified that:
 He had returned to his insurance office from a trip to the bank about 1:30 p.m. on October 5, 2001, and was alone at his desk, when a robber came in, pointing a .45 automatic pistol at him.
 The robber demanded money, and Yarbrough gave the intruder approximately $100.00 from his pocket and desk drawer.
 The robber then rummaged through his desk and tried to pull the telephone cord out of the wall.
 Failing to accomplish that, the thief noticed an answering machine in the corner of the room.
 The robber knocked down trays to get over to that area, yanking on the answering machine to disconnect it.
 He advised the robber to leave before customers arrived.
 The robber told him to get on the floor.
 As he complied, Yarborough noticed that the gunman had on "real white tennis shoes."
 When the robber left, he called the authorities via 911.
Madeleine Prater, testifying through an interpreter because of a hearing impairment, declared that:
 On the day of the robbery, she twice saw the defendant walking "cool like" in her yard around the time of the robbery.
 Even though she asked him to move into the street and out of her yard, he went around her house anyway.
 The second time the man was near her house, he suddenly darted and jumped a ditch because police were chasing him.
 She got a good look at his "pretty face," noticing that he was wearing a royal blue shirt.
 She later identified the suspect at the police station and in open court.
Another witness, Investigator Ron Lara, later established that Prater's house was one street over from the insurance office.
Cindy Beach, a mail carrier, testified Yarborough told her he had been robbed and gave her a description of the robber. On her mail route a few minutes later, she saw someone fitting the description getting out of a vehicle in front of Gray's Barbershop. She indicated that it was the eyes and shoes that made her think this person was the robber. She alerted the police.
Gerald Boley testified that he was working patrol for the Bastrop Police Department on the day of the crime. He and a trainee, Kirk Brown, were looking for the robber in the vicinity of the crime and were told by the dispatcher to go to Gray's Barbershop. There they approached King because he matched the physical description of "a black male wearing a dark blue sweatshirt or sweater with blue jeans, very light complected with hazel or green eyes."
Boley testified that the defendant told him he had been at the barbershop "for a while." He testified that when the defendant was taken to the insurance agency, Yarborough identified him as the armed robber.
The barbershop owner, Isaac Calvin Gray, testified that the defendant had been in his shop for about five or ten minutes before the police arrived.
*600 Barbara Patton, a dispatcher with the Bastrop Police Department, produced and identified the log of incoming and outgoing contacts for October 5, 2001.
Bastrop Police Department Investigator Ron Lara testified that:
 The police log reflected that Yarborough had reported the description of the robber as "black male, six feet tall, blue pullover sweatshirt, blue pants, white shoes, green eyes, short hair."
 The barbershop where the defendant was picked up was 3/10 of a mile from the insurance office.
 King was taken back to the insurance office, where Yarborough immediately identified him as the armed robber.
 Two wads of money were found in the suspect's pockets (four twenty-dollar bills, two ten-dollar bills, and a five-dollar bill were together, and another group of bills contained one twenty, seven fives, and twenty ones).
 Yarbrough had told him that he gave the robber one twenty-dollar bill, eight five-dollar bills, and twenty one-dollar bills from the register and two ten-dollar bills from his wallet;
 When asked how much money he thought he had, the defendant's answer as to amount and origin kept changing.
 King denied being at or near the insurance agency that day, claiming that he was with Terrance Smith during the time of the robbery.
 No weapon was ever recovered.
Brad Fife, a lieutenant with the Morehouse Parish Sheriff's Department, testified that he had taken fingerprints from the defendant and identified the card with his signature on it.
A police officer for the Bastrop Police Department, Steve Fuller, testified that he had retrieved the telephone and answering machine from the crime scene. He told in detail how he had found a partial print on the answering machine and why he had opted to photograph it instead of lifting it.
Brian Shoemaker, a deputy with the Morehouse Parish Sheriff's Office, was tendered as an expert in classification and comparison of fingerprints. The trial judge removed the jury and required the state to present its evidence outside their presence before he would qualify him as an expert. The trial court then gave the state an opportunity to make a better exhibit of the prints. The defense counsel did not object to this procedure. The state brought Fuller back to testify about the new photographs he had taken, showing the latent fingerprint on the answering machine.
After more testimony from Shoemaker, the trial court found that he was an expert in fingerprint identification and that the charts of King's fingerprints could be used as evidence. The witness then testified at length about the comparison of the defendant's known prints to the photograph of the partial print taken from the answering machine, finally opining that the prints were a match.
The last witness called by the state was Curtis Stephenson of the Bastrop Police Department, who testified that the minimum number of fingerprint point comparisons established by the FBI was seven.
The defense called Juane Perry as an alibi witness. Perry, who was identified as the defendant's cousin, testified that he was with the defendant from approximately 12:30 p.m. to 1:30 p.m. on the day of the robbery. During cross-examination, he said he could not recall what the defendant was wearing that day. He denied selling drugs with the defendant that day. He denied that Terrance Smith had been with *601 him and the defendant during the time of the robbery.

DISCUSSION
Defendant argues these points:
 The victim misidentified the defendant because the victim by his own admission could not see the robber's whole face and was unsure which hand the robber used to hold the gun; and
 The deaf witness testified that the intruder ran when he "heard" the police.
The state argues that both the direct and circumstantial evidence show that the defendant was the armed robber. In addition to the victim's identification of the armed robber, the state presented evidence to show that the defendant's fingerprint was at the scene of the crime.
La. R.S. 14:64 provides:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
B. Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, State ex rel. Gilliam v. State, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
In cases involving a defendant's claim that he was not the perpetrator of the crime, or where he remains silent, the Jackson rationale requires the State to negate any reasonable possibility of misidentification in order to carry its burden of proof.
State v. Baker, 28,152 (La.App. 2 Cir. 5/8/96), 674 So.2d 1108, writ denied, 96-1909 (La.12/6/96), 684 So.2d 925.
The defendant argues that he has been misidentified as the armed gunman. His theory is that the victim was not in a position to identify the gunman, since the victim reported that the robber had a bandana over his nose and mouth. However, the jury heard the victim's testimony and observed him while he was cross-examined about how much of the assailant's face was uncovered during the robbery. The victim was very clear that he had opportunity to study the eyes very closely, stating, "I looked right in his eye, anybody holding a *602 gun on me I'm going to look at their eyes to see what they're going to do."
On direct examination, the victim replied "his eyes" when asked if there was anything unusual about the person who walked into his office. The victim also had noted the clothes the gunman wore and found that the gunman's tennis shoes were unusually white. Further, immediately after the incident, the victim told the postal carrier and law officers that the robber had distinctive green eyes.
When the defendant was brought back to the scene of the crime, the victim immediately and without any hesitation identified King as the armed robber.
This testimony was sufficient for a rational jury to find that the defendant was the man who robbed Yarborough at gunpoint. The jury obviously believed the victim when he said the defendant was that man. The jury also had the opportunity to view the defendant's eyes and determine if they were so distinctive that they would be easily recognizable.
Even without this positive identification from the victim, the circumstantial evidence is also overwhelming. The defendant was nabbed only 3/10 of a mile from the site of the robbery less than an hour after the crime was committed. The postal worker alerted authorities when she saw King walking into the barbershop. She thought his eyes and shoes fit the description the victim had given her.
A woman who lived near the insurance office reported to the police that a man had been in her yard and ran when the police came into the area. This event happened right after the robbery. She identified the defendant in court as the "same face, same body, same person."
The defendant had two wads of cash on him when apprehended. One of the bundles of money closely matched the amount and denominations of the cash taken from the victim. Taking both bundles of money, the bills match the denominations that the victim stated were taken.
Further, the record shows that a partial fingerprint belonging to the defendant was found at the site. A latent print found on the answering machine was matched to the print of his small finger. This was the same answering machine that the victim identified as the one the robber grabbed in an attempt to disconnect it.
Moreover, the alibi witness's testimony did not support what the defendant had told the officer regarding where he had been. The defendant presented neither adequate nor convincing evidence to rebut the positive identification by the victim and other witnesses who placed him near the scene of the crime.
The jury found that the defendant was guilty of armed robbery. It is the function of the trier of fact to make such a determination, addressing the believability or weight of the testimony. This record certainly contains more than enough evidence to find that the facts sufficiently support that the defendant was the armed robber and that no misidentification took place. Accordingly, we affirm.

DECREE
The defendant's conviction and sentence are AFFIRMED.